J-A05008-20
J-A05009-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| JOHN PEREZ AND RAYNA PEREZ, HIS WIFE | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSEPH C. MAROON, M.D.; UPMC; UPMC PRESBYTERIAN; UPMC PRESBYTERIAN-SHADYSIDE; AND TRI-STATE NEUROSURGICAL ASSOCIATES-UMPC | : | No. 184 WDA 2019 |
| | : | |
| | : | |
| APPEAL OF: RAYNA PEREZ | : | |

Appeal from the Judgment Entered January 23, 2019
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-11-024543

| | | |
|---|---|---|
| JOHN PEREZ AND RAYNA PEREZ, HIS WIFE | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSEPH C. MAROON, M.D.; UPMC; UPMC PRESBYTERIAN; UPMC PRESBYTERIAN-SHADYSIDE; AND TRI-STATE NEUROSURGICAL ASSOCIATES - UPMC | : | No. 211 WDA 2019 |
| | : | |
| | : | |
| APPEAL OF: JOHN PEREZ | : | |

Appeal from the Judgment Entered January 23, 2019
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD 11-24543

J-A05008-20
J-A05009-20

BEFORE:   BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    FILED JUNE 10, 2020

Appellant, John Perez, appeals at docket number 211 WDA 2019 from the January 23, 2019 judgment entered in favor of Appellees, Joseph C. Maroon, M.D., UPMC, UPMC Presbyterian, UPMC Presbyterian-Shadyside, and Tri-State Neurosurgical Associates-UPMC, following a jury trial.  In addition, his ex-wife, Rayna Perez, also appeals from the January 23, 2019 judgment at docket number 184 WDA 2019.[1]  We affirm.

The trial court provided the following statement of the case:

[Mr. Perez] and [Ms. Perez] commenced this medical malpractice action by filing a Praecipe for Writ of Summons on November 28, 2011.[2]  [They] then filed a Complaint on May 17, 2012, alleging [that Dr. Maroon] negligently performed a cervical discectomy on Mr. Perez on November 30, 2009.[3]  Generally speaking, Mr. Perez alleges that Dr. Maroon negligently placed a surgical screw during the procedure into the cervical disc space, rather than bone, resulting in, among other things, a non-union.[4]  This non-union

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] We sua sponte consolidate these appeals pursuant to Pa.R.A.P. 513.  See Pa.R.A.P. 513 ("Where there is more than one appeal from the same order, or where the same question is involved in two or more appeals in different cases, the appellate court may, in its discretion, order them to be argued together in all particulars as if but a single appeal.").

[2] Mr. Perez and Ms. Perez married on October 11, 2011, and finalized their divorce in April of 2016.  See N.T. Trial, 5/7/18-5/30/18, at 2601-02, 2603; Mr. Perez's Brief at 13.

[3] A discectomy is the removal of a disc.  See Appellees' Brief at 12.

[4] In more detail, Mr. Perez advances:

- 2 -

eventually led to multiple revision procedures, and allegedly ended Mr. Perez's career as a horse racing jockey. Following several years of pre-trial litigation, a jury trial was held between May 7, 2018 and May 30, 2018, after which the jury returned a verdict in favor of Dr. Maroon. Although the jury found Dr. Maroon's conduct fell below the applicable standard of care, it nonetheless found the negligence was not a factual cause of any harm to Mr. Perez.

On June 7, 2018, Mr. Perez and Ms. Perez both filed Motions for Post-Trial Relief.[1] Thereafter, numerous additional motions were filed by both parties. On August 23, 2018, this [c]ourt held argument on the Motions for Post-Trial Relief. On October 4, 2018, this [c]ourt denied the Motions for Post-Trial Relief, and subsequently granted Dr. Maroon's Motion to Strike Affidavit of John C. Archiniaco.[5] Eventually, on January 28, 2019, Mr. Perez

_____

What normally occurs during a C5-6 fusion procedure is that screws are anchored in both the C5 and C6 bones. Those screws then hold the plate that contains the cage with the graft so that the graft does not come loose and the fusion occurs. In Mr. Perez's case, Dr. Maroon removed too much bone from C5, inserted a superior screw that was too thick and did so into the superior disc space at C4-5, as opposed to the bone.

Mr. Perez's Brief at 11 (internal citations omitted). See also Appellees' Brief at 12-13 (explaining that, during the procedure, "the area where bone had been removed was filled with an insert (referred to as a titanium 'cage') and bony material from the hospital bone bank. It is anticipated in this type of surgery that the bony material and the 'cage' will integrate with the patient's native bone, resulting in a fusion or union. Thus[,] the terms non-fusion or non-union refer to circumstances when that integration fails to occur. A small plate was also placed to bridge the two vertebrae, with small (half-inch) screws, one in the vertebrae above the disc and one in the vertebrae below the disc. The plate does not facilitate union; its purpose is to allow the patient to avoid having to wear a neck brace post-operatively").

[5] Mr. Archiniaco provided investigative services on Mr. Perez's behalf. See Trial Court Opinion ("TCO"), 6/25/19, at 9. His affidavit provided that the woman who was seated at trial as juror number 11 ("Juror 11") was "friends on Facebook" with Ms. Perez's divorce attorney, Elisabeth Molnar, Esquire, and noted that there were "some Facebook 'communications in the form of 'likes' on posts and photos' between Ms. Molnar and [Juror 11] sometime prior to

and Ms. Perez both filed Notices of Appeal.[6] [The trial court] then issued Concise Statement Orders on February 1, 2019. On February 15, 2019, Mr. Perez and Ms. Perez filed identical Concise Statements of Matters Complained of on Appeal….

> [1] Ms. Perez joined and incorporated Mr. Perez's request for Post-Trial Relief because she had a loss of consortium claim derivative to the underlying claim.

TCO at 3-4.

### Mr. Perez's Appeal

We address Mr. Perez's issues first. He raises the following issues for our review:

> 1. Whether the trial court committed reversible error in permitting the use of excerpts of Tammy Albaugh's deposition at trial; failing to allow [Mr. Perez] to call Ms. Albaugh on rebuttal; and in refusing to provide an adverse inference regarding her intentional failure to appear?
>
> 2. Whether the trial court committed reversible error in improperly permitting hearsay statements of Loretta Blyshak to be used at trial and then failed to provide Mr. Perez an[] adverse inference instruction for her failure to appear at trial?
>
> 3. Whether the trial court committed reversible error in failing to grant Mr. Perez's request for judgment notwithstanding the verdict [("JNOV")]?
>
> 4. Whether the trial court committed reversible error in improperly not permitting an amendment of the [c]omplaint to include allegations pertaining to informed consent and/or adding an

_____

trial." Id. During jury selection, Mr. Perez had mentioned Ms. Molnar "as one of thirty-three potential witnesses that would be called to testify in the case[.]" Id. (citation omitted). However, Ms. Molnar ultimately did not testify at trial. Id.

[6] Judgment was entered in favor of Appellees and against Mr. and Ms. Perez on January 23, 2019.

alternative allegation that Dr. Maroon was not present to perform Mr. Perez's surgery?

Mr. Perez's Brief at 5.[7]

### Mr. Perez's First Issue

In Mr. Perez's first issue, he argues that the trial court "committed reversible error in permitting the use of excerpts of Tammy Albaugh's deposition at trial; failing to allow [Mr. Perez] to call Ms. Albaugh on rebuttal; and in refusing to provide an adverse inference regarding her intentional failure to appear[.]" Id. He contends that Ms. Albaugh, a nurse who worked with Dr. Maroon, was "a critical witness in this case because of issues surrounding a handwritten note that she purportedly created on an electronic medical record allegedly after a phone conversation with Mr. Perez on April 19, 2010. The note concerned a key issue in the case — whether Dr. Maroon

_____

[7] In his Summary of Argument section of his brief, Mr. Perez states that he also "incorporates by reference the two issues and arguments presented by co-Appellant, [Ms.] Perez, in her Brief for Appellant as if set forth more fully herein." Mr. Perez's Brief at 15 n.3. See also Pa.R.A.P. 2137 ("In cases involving more than one appellant or appellee, including cases consolidated for purposes of the appeal pursuant to Rule 513 (consolidation of multiple appeals), any number of either may join in a single brief, and any appellant or appellee may adopt by reference any part of the brief of another."); Commonwealth v. Briggs, 12 A.3d 291, 343 n.48 (Pa. 2011) (noting that Rule 2137 "allows a party to an appeal which has multiple parties or involves consolidated cases to incorporate by reference parts of briefs which another party has filed with the appellate court which is considering the appeal") (emphasis omitted).

did in fact offer a plate removal, i.e.[,] revision surgery, to Mr. Perez." Id. at 20 (citations omitted).[8]

> Initially, we note that our standard of review of a trial court's decision to admit or exclude evidence is well-settled:
>
> > When we review a trial court ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.
>
> "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused."

Stumpf v. Nye, 950 A.2d 1032, 1035-36 (Pa. Super. 2008) (citation omitted).

> Here, with respect to Ms. Albaugh, the trial court explained:
>
> At trial, [Appellees] sought to introduce [Ms. Albaugh's] deposition pursuant to Pa.R.C.P. 4020(a)(5), which provides as follows:
>
> > At the trial, any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented at the taking of the deposition or who had notice thereof if required, in accordance with any one of the following provisions: [a] deposition upon oral examination of a medical witness, other than a party, may be used at trial for any purpose whether or not the witness is available to testify.

_____

[8] Mr. Perez claims that, "[i]f the jury believed that Dr. Maroon offered Mr. Perez a revision surgery and that Mr. Perez either declined or did not follow up on Dr. Maroon's offer, then the jury could have potentially concluded that Dr. Maroon's negligence was not a factual cause of harm to Mr. Perez." Mr. Perez's Brief at 25 n.6.

[N.T. at] 3135-[]37. Mr. Perez opposed this request, arguing [that] Ms. Albaugh's deposition testimony should be precluded because it was hearsay; Mr. Perez further argued [that Appellees] failed to demonstrate [that] Ms. Albaugh was unavailable pursuant to Pa.R.E. 804. [Id. at] 3139-[]41. However, the deposition of a nonparty medical witness is permitted regardless of whether the witness is available to testify at trial. Pa.R.C.P. 4020(a)(5). Relying on Russell v. Albert Einstein Medical Center, Northern Div., 673 A.2d 876 (Pa. 1996), this [c]ourt determined [that] Ms. Albaugh, a registered nurse who was not a party to the litigation, qualified as a nonparty medical witness. [N.T. at] 3149-[]50.

Furthermore, this [c]ourt properly denied Mr. Perez's request to call Ms. Albaugh on rebuttal because counsel for Mr. Perez had previously deposed Ms. Albaugh, and had a full and fair opportunity [to] call her as a witness during his case-in-chief, and admittedly failed to do so, with no explanation. [Id. at] 3280; see Downey v. Weston, 301 A.2d 635, 641 (Pa. 1973) ("The trial court has discretion in excluding as rebuttal evidence that which is properly part of the case[-]in[-]chief."). This [c]ourt also properly denied Mr. Perez's request to provide the jury with an adverse inference instruction as to Ms. Albaugh's failure to appear at trial. [N.T. at] 3280-[]81. Once again, counsel for Mr. Perez deposed Ms. Albaugh prior to trial[,] and made no effort to call her for Mr. Perez's case-in-chief. [Id.]

TCO at 22-23.

### Use of Ms. Albaugh's Deposition at Trial

Mr. Perez initially challenges the trial court's decision on the basis that "Ms. Albaugh's testimony should not have been read into the record." Mr. Perez's Brief at 19 (unnecessary capitalization and emphasis omitted). His argument in this respect is two-fold: first, he says that Rule 4020(a)(5) "allows a deposition to be used at trial if the witness is not a party. Ms. Albaugh, while not named as a defendant in this case, was an agent of Appellees, UPMC and Dr. Maroon, who acted within the scope of her employment and her

relationship to Appellees providing medical care and therefore is a party under the rule." Id. at 21. Mr. Perez also contends that, "[a]lthough the term 'party' is not defined in Rule 4020 nor is it defined in Russell, Pa.R.E. 803(25) provides guidance for what qualifies as an opposing party's statement, defining party statements to include statements made in a representative capacity." Id. at 21-22 (citation and footnote omitted).

Second, Mr. Perez advances that, "while subsection (5) of Rule 4020(a) does state that a deposition may be used at trial regardless of whether or not the witness is available, subsection (a) states that 'any part [or] all of a deposition, so far as admissible under the rules of evidence, may be used...[.]'" Id. at 22 (emphasis in brief; citation omitted). He states that Pa.R.E. 804 "governs exceptions to the hearsay rules when a declarant is unavailable[,]" and none of the criteria for being unavailable apply to Ms. Albaugh. See id. at 22-24.[9] Therefore, Mr. Perez argues that "Ms. Albaugh did not meet the criteria of being unavailable so as to circumvent the hearsay rules and allow her deposition testimony to be read into the record." Id. at 25.

_____

[9] Regarding Ms. Albaugh's absence at trial, Appellees' counsel explained to the trial court, "I don't want to bring her in here and subject her to what these witnesses have been subjected and another four hours of cross-examination of the nature that we have experienced throughout this trial." N.T. at 3148. See also id. at 3151 ("Your Honor, she can't come in after – I have sat through this trial. I've never seen anything like this."); TCO at 6-7 ("For the benefit of the appellate court, this court notes that this trial was a three-week long, fiercely disputed, highly emotional case, in which the parties did not agree on much, if anything.").

- 8 -

We reject both of these arguments. With respect to Mr. Perez's first argument, Appellees astutely discern that, "[w]hile the Rules of Civil Procedure do not define a 'party,' the law provides that a 'party' is a 'person who commences or against whom relief is sought in a matter....'" Appellees' Brief at 25 (citing 42 Pa.C.S. § 102)). Moreover, Appellees point out that, "[h]ad the Rules Committee intended agents of a party to be exempt from Rule 4020(a)(5), it surely would have crafted a rule reflecting this intent." Id.[10] Finally, though Mr. Perez correctly states that Russell did not address the definition of 'party' under Rule 4020, see Mr. Perez's Brief at 26 n.8, we observe that the nurse in that case was employed by the defendant hospital, and her deposition was nevertheless admitted at trial pursuant to Rule 4020(a)(5). See Russell, supra. Thus, we conclude that Ms. Albaugh is not a 'party' for purposes of Rule 4020(a)(5).

Regarding Mr. Perez's second argument, we agree with the trial court and Appellees that witness availability is irrelevant under Rule 4020(a)(5), which states that "[a] deposition upon oral examination of a medical witness, other than a party, may be used at trial for any purpose whether or not the witness is available to testify." Pa.R.C.P. 4020(a)(5) (emphasis added).

_____

[10] We note that the Rules Committee did specifically mention agents in other provisions of Rule 4020. Namely, Rule 4020(a)(2) states that "[t]he deposition of a party or of any one who at the time of taking the deposition was an officer, director, or managing agent of a party or a person designated under Rule 4004(a)(2) or 4007.1(e) to testify on behalf of a public or private corporation, partnership or association or governmental agency which is a party, may be used by an adverse party for any purpose." Pa.R.C.P. 4020(a)(2) (emphasis added).

While Mr. Perez is again correct that the Russell Court did not reach the issue of why the nurse in that case was unavailable to testify at trial, see Mr. Perez's Brief at 26 n.8, the Court noted that the trial court admitted the nurse's deposition into evidence "without any showing that she was unavailable to testify." Russell, 673 A.2d at 877 (emphasis added). This fact supports that availability, and the circumstances surrounding a witness's availability, do not matter under Rule 4020(a)(5). Further, Appellees persuasively ascertain that the comment to the rule against hearsay, Pa.R.E. 802, states that "[o]n occasion, hearsay may be admitted pursuant to another rule promulgated by the Pennsylvania Supreme Court. For example, in civil cases, all or part of a deposition may be admitted pursuant to Pa.R.C.P. No. 4020...." Pa.R.E. 802, Comment; see also Appellees' Brief at 23. As such, we concur with Appellees that Rule 4020 "permits the admission of deposition testimony notwithstanding the limitations of the hearsay rule." Appellees' Brief at 23. Accordingly, the trial court did not err or abuse its discretion in allowing Appellees to read the deposition testimony of Ms. Albaugh at trial.

### Failing to Allow Mr. Perez to Call Ms. Albaugh on Rebuttal

Mr. Perez next complains that, "[s]ince the [trial c]ourt allowed Ms. Albaugh's testimony to be read into evidence via her deposition, Mr. Perez should have then been permitted to call Ms. Albaugh as a live witness on rebuttal." Mr. Perez's Brief at 28. He explains that he "did not call Ms. Albaugh during his case-in-chief because he believed that Appellees would call her as a live witness during their case." Id. He adds that "there was simply no

reason for Mr. Perez to call Ms. Albaugh in his case-in-chief on the issue of causation because (1) counsel for Appellees indicated that they intended to call her in their case-in-chief; (2) Mr. Perez already had direct evidence of an admission against interest made by Dr. Maroon on a disability form where Dr. Maroon admitted that Mr. Perez was disabled from the date of his initial surgery on November 30, 2009[,] performed by Dr. Maroon; and [(3)] it was [Appellees'] burden to rebut what had already been presented." Id. at 29 (citations omitted). Further, Mr. Perez contends that "it would have also been proper for [Ms.] Albaugh to be called during rebuttal because at the time of her deposition, Mr. Perez did not have additional facts and evidence that he needed to properly cross-examine [Ms.] Albaugh at her deposition." Id. at 30.

We deem this claim waived. The trial transcript reveals the following occurred at trial:

> [The trial court]: … So as of now, my ruling is we'll have the jury come in. We'll let them use [Ms. Albaugh's] deposition.
>
> [Mr. Perez's attorney]: Your Honor, then I would ask that they make her available tomorrow when they're done reading it for my rebuttal case.
>
> I have her – I can give her notice to attend, I'm pretty sure. She's their employee. They are hiding her. I would like her to be brought in live so that she can be interrogated in front of the jury and they can assess her credibility and not have [Mr. Perez's counsel] put on a pretend show about what Ms. Albaugh is really going to say.
>
> [The trial court]: Where is she? Why can't she come in?
>
> [Appellees' attorney]: Your Honor, she can't come in after -- I have sat through this trial. I've never seen anything like this.

[The trial court]: Okay.

[Mr. Perez's attorney]: Thank you. I take that as a compliment.

[The trial court]: So let's say you do what you do, and he wants to call her in rebuttal?

[Appellees' attorney]: That's not proper rebuttal. He took the deposition of [Ms.] Albaugh. [Mr. Perez's attorney] took her deposition. He had free rein to ask her whatever questions he wanted to ask her.

There's no rebuttal. He was supposed to put her in his case[-]in[-]chief if her testimony was necessary.

So there's no issue -- he can't possibly suggest that her deposition, which he took, is raising an issue which he could not have anticipated.

[The trial court]: All right. Let's – you know, like I said, that's my ruling. We're going to let you read the deposition tomorrow. We'll see what happens.

Again, plan on, you know, right as soon she is done, we'll take a little bit of time, but we're going to go over points and everything.

[Mr. Perez's attorney]: Your Honor, just to be clear, is she in the country? Is she here present, because opposing counsel, I mean, this issue may come up.

[The trial court]: What I've learned in these past three weeks is to deal with issues as they arise, and as of right now, that issue has not arisen. So we'll take it one step at a time.

...

[Mr. Perez's attorney]: [A]m I going to be permitted to read counter-designations even if I'm not going to be allowed to call the witness now? I assume I can do that.

[Appellees' attorney]: Certainly. That's the rule.

[Mr. Perez's attorney]: Oh, okay.

N.T. at 3150-53 (emphasis added). Though the trial court appeared to take

a wait-and-see approach, the next day, when Appellees' counsel concluded

reading Ms. Albaugh's deposition, Mr. Perez did not request to call Ms. Albaugh as a rebuttal witness. See id. at 3194.[11] Because Mr. Perez failed to renew his request at the appropriate time at trial, he has waived his claim with respect to calling Ms. Albaugh as a witness on rebuttal. See Commonwealth v. Petterson, 49 A.3d 903, 913-14 (Pa. Super. 2012) (determining that the appellant's failure to renew his request for a continuance constituted a waiver of any claim that the trial court had failed to grant a continuance where the trial court had, at best, conditionally denied the continuance request); Keffer v. Bob Nolan's Auto Service, Inc., 59 A.3d 621, 657-58 (Pa. Super. 2012) ("When the trial court overlooks or fails to rule on an issue, the party seeking the court's ruling must remind the court that it has not ruled and obtain a definitive ruling on the issue. Failing to do so results in the waiver of the issue not ruled upon.") (citations omitted).

Moreover, we observe that Mr. Perez has also waived certain aspects of his present argument by failing to raise such theories in his brief in support of his post-trial motion. Specifically, therein, he did not argue to the trial court that he had no reason to call Ms. Albaugh in his case-in-chief on the issue of causation. See Mr. Perez's Brief at 29 (stating that "there was simply no reason for Mr. Perez to call Ms. Albaugh in his case-in-chief on the issue of

_____

[11] Mr. Perez acknowledged in his brief in support of his post-trial motion that the trial court did not definitively deny his request to call Ms. Albaugh as a witness on rebuttal. See Mr. Perez's Brief in Support of Post-Trial Motion, 7/13/18, at 35 ("... [Mr. Perez] sought to call Ms. Albaugh during rebuttal. The [c]ourt seemingly did not permit [Mr. Perez's] counsel to do so although admittedly the record is somewhat unclear.") (citations omitted).

causation…"); see also Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); Newman Development Group of Pottstown, LLC v. Genuardi's Family Market, Inc., 98 A.3d 645, 658 n.16 (Pa. Super. 2014) ("A new argument cannot be raised in support of an issue on appeal if it was not first presented before the trial court. Thus, this argument is waived.") (citation omitted). Instead, before the trial court, Mr. Perez only contended that he "did not call Ms. Albaugh during his case-in-chief because he believed that [Appellees] would call her as a live witness during their case[,]" and complained that he had gained additional facts and evidence since Ms. Albaugh's deposition that he needed in order to properly examine her. See Mr. Perez's Brief in Support of Post-Trial Motion at 35. Consequently, based on the arguments before it, the trial court weighed that "counsel for Mr. Perez had previously deposed Ms. Albaugh, and had a full and fair opportunity [to] call her as a witness during his case-in-chief, and admittedly failed to do so, with no explanation." TCO at 23 (emphasis added). We would discern no error or abuse of discretion by the trial court in this regard. As Appellees state, "If Mr. Perez required testimony from [Ms.] Albaugh for purposes of his evidence, he could have called her as a witness during his case-in-chief. … The mere fact that Mr. Perez's counsel … 'expected' [Appellees] to call [Ms. Albaugh] during their case-in-chief does not bear on whether [Ms.] Albaugh was an appropriate rebuttal witness." Appellees' Brief at 27. As such, no relief is due on this basis.

<u>Refusing to Provide an Adverse Inference Instruction</u>

Finally, Mr. Perez argues that the trial court "should have provided the jury with an adverse inference instruction with respect to [Ms.] Albaugh's failure to appear at trial[,]" specifically Pennsylvania Suggested Standard Jury Instruction 5.40 (Civ) – Failure to Call a Witness - Adverse Inference. Mr. Perez's Brief at 31 (unnecessary capitalization and emphasis omitted). He points to case law stating that, "[w]here evidence which would properly be part of a case is within the control of the party whose interest it would naturally be to produce it, and without satisfactory explanation, he fails to do so, the jury may draw an inference that it would be unfavorable to him." Id. at 32 (citing Rupnik v. Pa. R. Co., 194 A.2d 906, 909 (Pa. 1963)) (emphasis in brief). Mr. Perez claims that Appellees had sole control over Ms. Albaugh, her testimony was expected to favor Dr. Maroon, and Appellees did not offer a satisfactory explanation as to why she was unavailable. Id. As a result, Mr. Perez says that he "was prejudiced, as the jury was left to speculate as to whether it was somehow Mr. Perez's decision not to call this witness." Id.

We recognize that "[t]he decision to issue a missing witness instruction, or alternatively whether to permit counsel to make an argument on closing equivalent to such an instruction, is a matter within the trial court's discretion which this Court will not overturn absent manifest abuse." Hawkey v. Peirsel, 869 A.2d 983, 986 (Pa. Super. 2005) (internal quotation marks and citation omitted). Further, "availability is not an abstract concept but a fact-based matter. Absent a showing that the witness in question was 'peculiarly

available' to one party and not the other, we will not disturb a trial court's exercise of discretion in denying a party the opportunity to argue an adverse inference in closing." Id. at 988-89. To illustrate, in Hawkey, this Court agreed that the plaintiffs should not be permitted to urge the jury to draw an adverse inference against a hospital for not calling two of the nurses it employed to testify at trial, where the plaintiffs presented no evidence that the hospital exercised exclusive control over them or that the nurses were not equally available to both parties. See id. at 987-89. This Court noted that the plaintiffs in that case had advance notice of the two nurses' potential relevance to the case, but made no effort to depose them and ensure their appearance at trial. Id. at 989.

Here, Mr. Perez has not demonstrated that Ms. Albaugh was 'peculiarly available' to Appellees. Appellees aptly discern that Ms. Albaugh "was known to Mr. Perez and, in fact, was identified in his Pretrial Statement. [He] made no efforts to secure [her] attendance at trial, and her status as an employee of one of the defendants cannot make her 'unavailable' for purposes of the 'missing witness' rule." Appellees' Brief at 28 (citing Hawkey, supra). Indeed, at trial, Mr. Perez's counsel conceded that he could have called Ms. Albaugh in his case-in-chief. See N.T. at 3278, 3280; see also Mr. Perez's Brief in Support of Post-Trial Motion at 35 (claiming that he did not call Ms. Albaugh in his case-in-chief only because he believed that Appellees would call her as a live witness during their case). Accordingly, the trial court observed that "Mr. Perez deposed Ms. Albaugh prior to trial[,] and made no

effort to call her for Mr. Perez's case-in-chief." TCO at 23 (citation omitted). Thus, because Mr. Perez has not demonstrated that he could not have called Ms. Albaugh, the trial court did not abuse its discretion in refusing to give an adverse inference instruction due to Ms. Albaugh's failure to appear at trial.

### Mr. Perez's Second Issue

In Mr. Perez's second issue, he argues that "the trial court committed reversible error in improperly permitting hearsay statements of Loretta Blyshak[] to be used at trial and then failing to provide Mr. Perez an[] adverse inference instruction for her failure to appear at trial." Mr. Perez's Brief at 32 (unnecessary capitalization and emphasis omitted). By way of background, according to Mr. Perez, Ms. Blyshak, a former employee of UPMC, "accessed Mr. Perez's medical records relating to his hospital admission, hours after-the-fact[,] and documented an alleged conversation between Mr. Perez's mother[, Mary Ann Perez,] and herself." Id. at 33 (emphasis, citation, and footnote omitted); see also id. at 6. Mr. Perez describes that Ms. Blyshak documented the alleged conversation in the 'Spiritual Comments' section of his medical record, relaying that "Mr. Perez's mother contacted a nurse and asked her to visit with Mr. Perez hoping that Mr. Perez would open up to her about his eating disorder and his desire to retire from being a jockey." Id. at 33 (citation omitted). At trial, after Mary Ann Perez had testified on direct-examination that Mr. Perez expected to return to horse racing following the surgery, Mr. Perez explains that Appellees' counsel then used Ms. Blyshak's record against her and displayed it to the jury during cross-examination. See

id. at 33-34; see also N.T. at 1510. Mr. Perez's counsel objected to its use, but the trial court overruled his objection after Appellees stated that they were using the record for "impeachment of the witness based on her representation as to what her son was saying and his desire to return [to racing]." See N.T. at 1552; see also Mr. Perez's Brief at 34.[12] Mr. Perez now argues that Ms. Blyshak's medical record was inadmissible hearsay and not proper impeachment, and insists that the trial court should have provided Mr. Perez with an adverse inference instruction because Appellees failed to call Ms. Blyshak as a witness. Id. at 34-41.

Initially, we deem Mr. Perez's claim regarding the adverse inference instruction waived due to his failure to include it in his Rule 1925(b) statement. Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); see also Order, 1/31/19, at 2 (stating that "[a]ny issue not properly included in [Rule 1925(b)] [s]tatement timely filed and served ... shall be deemed waived"). With respect to whether the trial court erred in improperly permitting Appellees to use Ms. Blyshak's statements at trial, we fail to see how any erroneous evidentiary ruling by the trial court regarding Ms. Blyshak's statements would be so prejudicial as to affect the verdict and warrant a new trial. See Folger v. Dugan, 876 A.2d 1049, 1054 (Pa. Super.

_____

[12] After Appellees' counsel showed Mary Ann Perez the record, she admitted that Mr. Perez, like many jockeys, "was what they call a heaver" and "would eat and heave." N.T. at 1554. She denied, however, that her son had a desire to retire. Id.

- 18 -

2005) ("Evidentiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment. In making this determination, we must consider whether a new trial would produce a different verdict. If there is any support in the record for the trial court's denial of a new trial, we must affirm the trial court's order.") (citations omitted); Gunn v. Grossman, 748 A.2d 1235, 1243 (Pa. Super. 2000) ("To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful to the complaining litigant. [W]e will not reverse the trial court's denial of a new trial unless there is a clear abuse of discretion or an error of law, which controlled the outcome of the case.") (citations omitted). Mr. Perez argues that, as a result of Ms. Blyshak's statements, Mary Ann Perez "was made to look like a liar on the stand rather than [Ms.] Blyshak. Further, Mr. Perez had absolutely no ability to refute her statements contained in the admission record … because she did not appear at trial." Mr. Perez's Brief at 40. Moreover, he claims that "[p]erhaps more significantly, the jury was able to hear statements of [Ms.] Blyshak relating to a conversation with [Mary Ann] Perez with the belief [sic] that Mr. Perez really did 'desire to retire' and was using Dr. Maroon's surgery as an excuse to retire (thus, that [Mr. Perez] had no real damages) even though the statements were unauthenticated hearsay, self-serving for Appellees[,] and completely unverified by anyone during the trial." Id. at 40-41 (emphasis omitted). He adds that the purported statement of Mary Ann Perez also served to "collaterally impeach" him. Id. at 41.

The jury in the case sub judice found that, although Dr. Maroon was negligent, his negligence was not a factual cause of any harm to Mr. Perez. As Appellees ascertain,

> [E]ven if the [t]rial [c]ourt's evidentiary ruling was somehow an abuse of discretion, the testimony could not have influenced the jury's verdict. [Mary Ann] Perez was impeached with a prior inconsistent statement about Mr. Perez's intention to retire. This bears only upon the issue of potential economic damages, e.g., the amount of earnings loss attributable to working as a jockey, not to the overarching issue of causation of any injury or damages, economic or non-economic. Since the jury found that any alleged negligence of [Appellees] did not cause harm to Mr. Perez, the jury never reached the "downstream" question of the nature of the earnings loss. Simply put, Mr. Perez's testimony (and Nurse Blyshak's entries in the hospital record impeaching that testimony) could not reasonably be deemed to have brought about that verdict. To the extent there was error, it was harmless.

Appellees' Brief at 32-33. We agree with Appellees that this evidentiary ruling could not have controlled the outcome of this case. No relief is due.

### Mr. Perez's Third Issue

In Mr. Perez's third issue, he claims that the trial court erred in failing to grant his request for JNOV. He argues that "he presented evidence such that no two reasonable minds would disagree that Dr. Maroon was at least a factual cause of harm to Mr. Perez." Mr. Perez's Brief at 41 (emphasis in brief). He contends that he "presented overwhelming evidence that Dr. Maroon was at least a factual cause of harm to him, and the court need look no further than [Appellees'] medical records, the testimony of Dr. Maroon[,]

and [Dr. Maroon's] own expert, [William C.] Welch[, M.D.], to establish the

same as a matter of law." Id. at 42-43 (emphasis in brief).[13]

We apply the following standard of review to such claims:

A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the [court] could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case.

V-Tech Services, Inc. v. Street, 72 A.3d 270, 275 (Pa. Super. 2013)

(citation omitted).

Here, in denying Mr. Perez's request for JNOV, the trial court explained:

A review of the record demonstrates [that] there was sufficient competent evidence to sustain the jury's verdict that the negligence of Dr. Maroon was not a factual cause of any harm to Mr. Perez.

[T]he theory of Mr. Perez's case was that Dr. Maroon negligently placed a surgical screw during the performance of a cervical discectomy, which resulted in a myriad of problems, including non-union, and ultimately resulted in the need for several revision surgeries. In fact, Mr. Perez had presented expert testimony to

---

[13] Mr. Perez cites to no case law supporting his JNOV argument in his initial brief, but instead relies on the Pennsylvania Suggested Standard Civil Jury Instruction for Factual Cause. See Mr. Perez's Brief at 41-42.

that effect, including the testimony of Robert Beatty, M.D., and Randy Davis, M.D. However, as with most medical negligence cases, Dr. Maroon likewise presented expert testimony that Dr. Maroon's conduct was not a factual cause of Mr. Perez's post-surgical issues.

For example, defense expert, [Dr. Welch,][3] ... testified that Dr. Maroon's pre-operative, intraoperative, and post-operative care was not a factual cause of harm to Mr. Perez. [N.T. at] 2911-[]14. Specifically, Dr. Welch testified the placement of the screw in the disc would not cause pain or impede cervical rotation, which were two of Mr. Perez's post-surgical complaints. [Id. at] 2912-[]13. Dr. Welch also testified [that] Mr. Perez's post-operative swallowing complaints were common issues shared by most patients undergoing this surgery, and that some patients have persistent swallowing problems even after the removal of the surgical plate, which was an issue for Mr. Perez. [Id. at] 2914-[]15.

> [3] Dr. Welch is a board certified neurosurgeon who practices at the Pennsylvania Hospital in Philadelphia, Pennsylvania. Dr. Welch performs approximately 600 operations a year and the vast majority of those operations are spine surgery. [N.T. at] 2890.

Furthermore, Dr. Welch noted that Mr. Perez's neck pain and swallowing problems persisted following the revision surgeries, and that Mr. Perez also experienced two non-fusions following the revision surgeries, again the identical problems that he faced following Dr. Maroon's initial surgery. [Id. at] 2951-[]54. Thus, Dr. Welch opined that Mr. Perez's symptoms might not have been any different even if the screw had been placed in a different position, and therefore any alleged negligence was not a factual cause of Mr. Perez's post-surgical problems. [Id. at] 2961-[]62. Clearly, Dr. Maroon put forth sufficient evidence to support the verdict, and where there is sufficient competent evidence to sustain the verdict, JNOV is not warranted. Condio v. Erie Ins. Exchange, 899 A.2d 1136 (Pa. Super. 2006).

In addition, the testimony [of] Mr. Perez's own treating physician, Andrew Hecht, M.D.,[4] would likewise support the jury's finding of no factual cause. One of Mr. Perez's primary concerns following Dr. Maroon's surgery was the non[-]union and loosening of the surgical applicances [sic], which was allegedly the result of the negligent placement of the surgical screw. However[,] Dr. Hecht

testified that following his revision surgeries in 2011 and 2012, he also found loose screws, loose hardware, and non-fusion, the same or similar findings following Dr. Maroon's surgery. [N.T. at] 887-88. Dr. Hecht acknowledged a patient can develop a non-fusion, pseudoarthrosis and loose screws, complaints of Mr. Perez following Dr. Maroon's surgery, even if the surgeon exercises very good or perfect technique. [Id. at] 914. Again, further evidence that would support a finding of no factual cause by the jury.

> [4] Dr. Hecht is the neurosurgeon that performed the revision surgeries, and testified as a fact witness in this case.

Thus, viewing the evidence in the light most favorable to [Appellees], and giving [Appellees] the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference[s], it was reasonable for the jury to find that Dr. Maroon's negligence did not contribute to Mr. Perez's injuries.

TCO at 14-17 (emphasis in original).

On appeal, Mr. Perez advances a myriad of arguments as to how the evidence presented at trial demonstrated that Dr. Maroon was at least a factual cause of harm to him. However, these arguments implicate the weight of the evidence, and do not address the issue of whether there was sufficient competent evidence to sustain the verdict. See V-Tech Services, Inc., supra ("Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact."); see also Morin v. Brassington, 871 A.2d 844, 851 (Pa. Super. 2005) ("[T]he remedy of entry of judgment in a party's favor is proper only when a party successfully challenges the sufficiency of the evidence. On the other hand, the remedy of a new trial is proper when the verdict rendered by the trial court indicates that the trial court abused its discretion when weighing the evidence.") (emphasis in original; citations omitted); Appellees' Brief at

36 n.14 (observing that "Mr. Perez's [b]rief includes over 10 pages of argument regarding the alleged 'overwhelming evidence' presented that Dr. Maroon was a factual cause of harm") (citation omitted). Accordingly, we need not address these arguments here, as they do not concern whether there was sufficient competent evidence to sustain the verdict.

With respect to the trial court's finding that sufficient competent evidence supported the verdict, Mr. Perez argues:

> The trial court found that the testimony of Appellees' expert, Dr. Welch, supported the jury's verdict, ignoring the admission of Drs. Maroon and Welch. Specifically, the court pointed to Dr. Welch's testimony that: (a) Dr. Maroon's inferior placement of the screw in the disc would not cause pain or impede Mr. Perez's ability to turn his head; and (b) Mr. Perez's neck pain and swallowing problems persisted following Dr. Hecht's revision surgeries and that Mr. Perez experienced two non-fusions following the revision surgeries.
>
> First, if it were true that Mr. Perez's pain and movement issues were not attributable to Dr. Maroon's inferior screw placement as Dr. Welch claimed, then why did Dr. Maroon prescribe 30 Oxycodone upon discharging Mr. Perez from the hospital, then over the course of only eight days in December post-surgery, prescribe[] ninety more Oxycodone[,] and then another forty on December 29? Beyond that, even more were prescribed by other physicians[] post Dr. Maroon scripts. Second, the record is devoid of any explanation from either Dr. Maroon or his expert as to the blatantly incorrect claim that Mr. Perez was well-fused when he was not. Third, ... Dr. Hecht established that Dr. Maroon's surgery required all [of] the revision surgeries.

Mr. Perez's Brief at 58-59 (internal citations omitted).

<u>Mr. Perez's Pain</u>

None of these arguments convinces us that the trial court erred in denying Mr. Perez's request for JNOV. First, Dr. Welch stated that he has had

"screws go into the dis[c] space[,]" and has "not seen them associated with pain." N.T. at 2912. Regarding Dr. Maroon's prescribing Oxycodone to Mr. Perez, Dr. Welch testified that Mr. Perez,

> was on narcotics before surgery. It's very common for patients on narcotics when they go into surgery to require narcotics for some period of time after surgery for whatever it was that we did, and he may have been on pain medicines for any one of these other multitude of injuries[.] I don't know exactly, but we prescribe them for pain.

N.T. at 3062. Thus, Mr. Perez's use of narcotics for pain does not undermine Dr. Welch's testimony that the placement of the screw in the disc space would not cause pain.

### Claim that Mr. Perez was Well-Fused

Second, Mr. Perez contends that, "[a]ccording to Dr. Welch, Mr. Perez's condition in April justified a revision. However, Dr. Maroon did not document any offer of a revision at that time. Instead, Dr. Maroon told Mr. Perez … that he was 'well fused[,'] when he was not. Dr. Maroon and his expert agree that such information was inaccurate." Mr. Perez's Brief at 54 (citations and footnote omitted). Mr. Perez argues that "[s]uch testimony … establishes that a JNOV is required because … as the months passed without a revision being offered, Mr. Perez's condition continued to deteriorate. Harm was being increased to him on a daily basis…." Id. at 55.

We disagree. At trial, Mr. Perez's counsel showed Ms. Albaugh's April 19, 2010 note — which we discussed supra — to Dr. Welch. N.T. at 3088. Ms. Albaugh's note stated: "Notified of results. Offered removal of titanium

plate as C5-6 level is well fused.  Pt will consider and contact office if he wishes plate removal."  Mr. Perez's Exhibit 134.  Mr. Perez's counsel then asked Dr. Welch:

> [Mr. Perez's counsel:] [L]et's make the assumption hypothetically that it was somehow proven that this note is accurate.  My client [contests that it] is.  But assume it's proven accurate and the jury accepts it as accurate, this is not an accurate representation of what's really occurring, because my client needs a revision at this point in time, and in here, it makes it sound like, oh, we'll just go look at the plate.  Right?  It's an understatement of what's going on.
>
> [Dr. Welch:] So the patient is experiencing neck pain and dysphagia,[14] correct?
>
> [Mr. Perez's counsel:] And cervical rotation issues and losing weight.
>
> [Dr. Welch:] That's--
>
> [Mr. Perez's counsel:] And a lot of other things, sir.
>
> [Dr. Welch:] The weight limitation I didn't see recorded.  I'm happy to do that as a hypothetical or not.  Okay.
>
> So now, the question is and you see it, why, what tests can we get?  So to address the dysphagia now at this point, Dr. Maroon is offering removal of the titanium plate.
>
> You do that, you're staring right at the fusion that you did.  You're going to explore the fusion.
>
> Does that mean he's going to revise it?  I don't know.  I'm sure you asked Dr. Maroon [if he] had planned to revise it at that period of time, but it means he's addressing this man's problems.  He's addressing them sequentially.
>
> Removing the plate one would hope might improve the dysphagia.  It might not.  It might.  But it would allow you to see at least whether or not the fusion is solid.

_____

[14] Dysphagia refers to difficulty swallowing.  See Appellees' Brief at 39.

You can address it right then. Whether or not he planned on doing a revision then, I don't know. He never says revision here.

[Mr. Perez's counsel:] Right. He never says revision anywhere in his notes, right?

[Dr. Welch:] In my opinion, in retrospect, does he need a fusion – does he need a revision of his fusion at this point? Probably. It's now six months. The man is not making the improvement that is expected.

[Mr. Perez's counsel:] Is it reasonable to just remove the plate and see?

[Dr. Welch:] It certainly is. I'll leave it at that.

[Mr. Perez's counsel:] So if the jury thinks and believes that this note – by the way, this statement here, "C5-6 level is well fused," that's just not based on reality, is it?

[Dr. Welch:] In retrospect, I don't think that's accurate.

N.T. at 3090-92.

In addition, Dr. Maroon noted at trial that, by 4 or 5 months after surgery, 90 to 98% of patients who have had this surgery have a fusion, and explained that:

The only way … to determine for certain that there is a fusion is by touching it, looking at it, feeling it, and seeing if it moves. That's the only way 100 percent certainly [sic] that you can determine if there's a fusion. That's what I offered in terms of removing the plate. That is part of the procedure when you do a revision surgery to see if there's any abnormalities.

Id. at 1997.[15]

Viewing this evidence in the light most favorable to Appellees as the verdict winner, giving them the benefit of every reasonable inference arising

_____

[15] Dr. Maroon also testified that "[i]f you go in to somebody's neck for a second time to remove a plate, it's automatic that you would check the fusion." N.T. at 1994.

from the evidence and rejecting all unfavorable testimony and inference, see V-Tech Services, Inc., supra, the jury could have believed that, though Dr. Maroon conveyed to Mr. Perez that he was well-fused when he was not, Mr. Perez did not follow up on Dr. Maroon's offer to remove the plate and thereby check the fusion.[16]  In fact, Mr. Perez himself recognizes that, "[i]f the jury believed that Dr. Maroon offered Mr. Perez a revision surgery and that Mr. Perez either declined or did not follow up on Dr. Maroon's offer, then the jury could have potentially concluded that Dr. Maroon's negligence was not a factual cause of harm to Mr. Perez."  Mr. Perez's Brief at 25 n.6; see also id. at 31 (noting that "a jury could have been erroneously misled into believing that if Dr. Maroon did in fact offer to remove the plate, and Mr. Perez failed to accept that offer, then Dr. Maroon would not have caused Mr. Perez['s] injuries.  In other words, Mr. Perez's injuries were his own fault because he failed to accept Dr. Maroon's corrective measures that could have reduced or alleviated his injuries.").  Thus, no relief is due on this basis.

### Dr. Hecht's Testimony

Third, Mr. Perez says that "Dr. Hecht established that Dr. Maroon's surgery required all [of] the revision surgeries."  Id. at 59.  He asserts that "Dr. Hecht testified that the four remedial surgeries he had to perform were

_____

[16] Appellees also point out that Dr. Hecht testified that Mr. Perez told him that Dr. Maroon had advised a possible revision from the original surgery, and explained that the earliest timeframe for having concerns about a fusion is usually six to eight months after surgery.  N.T. at 894-95, 902-03; see also Appellees' Brief at 39 (citations omitted).

all related to Dr. Maroon's initial 2009 surgery. Dr. Hecht: 'I think that the first surgery was the cause of the second surgery. And the second surgery – and so on. So it all starts somewhere.'" Id. at 57 (citations omitted). Mr. Perez argues that, "[d]espite that unequivocal testimony, the trial court somehow reinterpreted Dr. Hecht's testimony to support a finding in favor of Dr. Maroon." Id. at 57-58 (citation omitted).

In making this argument, Mr. Perez ignores that Dr. Hecht also testified at trial that patients could develop a non-fusion, pseudoarthrosis, and loose screws even if the surgeon exercises very good or perfect technique. N.T. at 914. As the trial court discerned, such testimony constitutes further "evidence that would support a finding of no factual cause by the jury." TCO at 17. Accordingly, we conclude that the trial court did not err in denying Mr. Perez's request for JNOV.

<u>Mr. Perez's Fourth Issue</u>

In Mr. Perez's final issue, he complains that the trial court "committed reversible error in improperly not permitting an amendment of the complaint to include an alternative allegation that Dr. Maroon was not present to perform Mr. Perez's surgery." Mr. Perez's Brief at 59 (unnecessary capitalization, emphasis, and footnote omitted). He explains:

> At the close of Mr. Perez's case, counsel for Mr. Perez sought to amend the complaint to include a subparagraph allegation that the reason the negligent acts occurred in this case is because Dr. Maroon was not present in whole or in part for the surgery. The court understood the issues and the reasons behind the amendment but deferred its ruling as to whether the amendments would be granted. The issue was later revisited during the

> proposed points for charge process on Friday, May 25, 2018. The court again deferred the issue. On Tuesday, May 29, 2018, the court denied Mr. Perez's motion to amend on the basis that it was too prejudicial to the defense.
>
> However, there was more than ample evidence presented to the jury that Dr. Maroon might have not … been present to perform[] Mr. Perez's surgery[,] which explains why numerous actions were done wrong or not at all.

Id. at 61-62 (internal citations omitted). Mr. Perez argues that "[a]n amendment to include such an allegation was necessary in order to conform Mr. Perez's complaint to the evidence presented at trial[,]" and claims that a jury "could have easily found that Dr. Maroon's negligence caused [Mr. Perez's] injuries because he did not even perform the procedure in the first place…." Id. at 62.

> We apply the following standard of review to such claims:
>
> A party may, at any time, with consent of an opposing party or by leave of court, amend his or her pleading. A trial court has broad discretion in ruling on a party's motion to amend the pleadings. An amendment will not be allowed, however, when it is against a positive rule of law, where it states a new cause of action after the statute of limitations has run, or when it will surprise or prejudice the opposing party.

Somerset Community Hosp. v. Allan B. Mitchell & Associates, Inc., 685 A.2d 141, 147 (Pa. Super. 1996) (internal citations omitted).

The trial court explained that it denied Mr. Perez's request to amend his complaint "as it was introducing a completely new cause of action into the case, two weeks into the trial. There is no doubt that allowing an amendment at that late stage would 'surprise and prejudice' Dr. Maroon, as for the seven years that the case existed, that was never a consideration in the defense of

the case." TCO at 29 (citations omitted). The trial court added that "to allow the amendment would create a completely new cause of action, of which the two year statute of limitations would have long since expired." Id. at 29-30 (citation omitted).

We discern no abuse of discretion. This Court has stated that "[a]n amendment introducing a new cause of action will not be permitted after the [s]tatute of [l]imitations has run in favor of a defendant. Only if the proposed amendment merely amplifies, as opposed to altering, the cause of action already averred, will it be allowed if the statute of limitations has run." Chaney v. Meadville Med. Ctr., 912 A.2d 300, 303-04 (Pa. Super. 2006) (citations omitted; some brackets added). Further, we observed that "[a] new cause of action does arise … if the amendment proposes a different theory or a different kind of negligence than the one previously raised or if the operative facts supporting the claim are changed." Id. at 304 (citations and emphasis omitted); see also John Goffredo and Sons, Inc. v. S.M.G. Corp., 446 A.2d 255, 256 (Pa. Super. 1982) ("In the context of amendment of pleadings, we have defined a new cause of action as a 'different theory' or 'basis for recovery.'").

Here, the statute of limitations for an action to recover damages for injuries caused by the negligence of another is two years. 42 Pa.C.S. § 5524. We have no reason to disagree with the trial court that the statute of

limitations has expired in this case.[17]  Moreover, as Appellees set forth, "Mr. Perez sought to amend his [c]omplaint to assert that, as an alternative to negligently performing surgery, Dr. Maroon did not actually perform the surgery.  This proposed amendment regarding Dr. Maroon not performing surgery would have fundamentally altered the type of malpractice alleged." Appellees' Brief at 43-44 (footnote omitted).[18]  We agree.  In addition, Mr. Perez has not convinced us that the trial court abused its discretion in determining that the amendment would have caused surprise and prejudice to Appellees.  See Mr. Perez's Brief at 63 (arguing that the amendment would

_____

[17] Mr. Perez cursorily advances that "Dr. Maroon denies to this day that he was not present for the surgery.  Thus, he is hard pressed to argue the statute of limitations is running on such a claim as he and his counsel dispute that such a claim has ever arisen to begin with."  Mr. Perez's Brief at 64 n.19; see also Mr. Perez's Reply Brief at 29 ("Appellees deny there is any evidence that Dr. Maroon was not in the room, therefore, they cannot simultaneously argue the statute of limitations has even begun to run, given the discovery rule and/or equitable tolling.") (citation omitted).  However, Mr. Perez does not sufficiently develop an argument in support of this contention and, therefore, we do not address this claim further.  See Commonwealth v. Gibbs, 981 A.2d 274, 284 (Pa. Super. 2009) ("It is [an a]ppellant's obligation to sufficiently develop arguments in his brief by applying the relevant law to the facts of the case, persuade this Court that there were errors below, and convince us relief is due because of those errors.  If an appellant does not do so, we may find the argument waived.") (citation omitted).

[18] Mr. Perez argues that he did "allege that Dr. Maroon did not take certain action in connection with his surgery.  The reason why he did not act (whether because of neglect or because he was not there) caused no surprise to Dr. Maroon."  Mr. Perez's Reply Brief at 29 (emphasis and citation omitted).  In support of this claim, Mr. Perez generally cites to his complaint, but does not specify which allegations convey that Dr. Maroon did not actually perform the surgery.  We decline to scour his 61-page complaint for him.

not have caused Appellees any undue surprise or prejudice because of a qui tam action that Mr. Perez does not elaborate on, and because of references to Dr. Maroon's alleged absence Mr. Perez says he made in his response in opposition to Appellees' motion for partial summary judgment on the issue of punitive damages).  Accordingly, no relief is due.

### Ms. Perez's Appeal

We next turn to Ms. Perez's appeal.  She raises the following issues for our review:

> 1. Whether the trial court committed reversible error in failing to grant a new trial or, in the alternative, an evidentiary hearing where after-acquired evidence confirmed the existence of an undisclosed relationship between Juror 11 and Ms. Molnar, an adverse witness[,] that was not disclosed at any time prior to the verdict being rendered?
>
> 2. Whether a new trial should have been awarded given that the verdict was against the weight of the evidence?

Ms. Perez's Brief at 6.[19]

Before we delve into Ms. Perez's issues, we address Appellees' application to quash her appeal, which remains pending before us.  Appellees argue that Ms. Perez, who has asserted a claim for loss of consortium, "cannot argue appellate issues unrelated to her loss of consortium claim[,]" and consequently ask us to quash her appeal and strike her brief.  Application to Quash, 1/16/20, at ¶ 20.  Citing to Scattaregia v. Shin Shen Wu, 495 A.2d

---

[19] Like Mr. Perez, Ms. Perez states that she "incorporates by reference the four issues and arguments presented by [Mr.] Perez in his Brief for Appellant as if set forth more fully herein."  Ms. Perez's Brief at 16 n.5.  See also Pa.R.A.P. 2137, supra; Briggs, supra.

552, 553, 554 (Pa. Super. 1985), Appellees explain that "Pennsylvania courts have long held that an action for loss of consortium is derivative[,]" and "[b]ecause a loss of consortium action has been viewed as derivative[,] its success in this Commonwealth has always been dependent upon the injured spouse's right to recover."  Application to Quash at ¶ 21.  Consequently, Appellees state that Ms. Perez "could not recover in this action unless the jury found that [Appellees] were negligent and a cause of harm; accordingly, at trial, [Mr. Perez] was the only party who presented evidence and/or testimony on the issue of liability because [Mr. Perez], and not [Ms. Perez], asserted a cause of action for negligence and thus, he bore the burden of proof with regard to that claim."  Id. at ¶ 22.  Appellees claim that Ms. Perez's brief "is simply an attempt to evade the word limit for appellate briefs[,]" and that "she, along with [Mr. Perez], are not entitled to a second [b]rief on distinct appellate issues by virtue of their divorce during the pendency of this lawsuit and her attainment of separate counsel."  Id. at ¶¶ 1, 30.

In response, Ms. Perez counters that, pursuant to Pa.R.A.P. 501, "any party who is aggrieved by an appealable order … may appeal therefrom[.]"  Ms. Perez's Answer, 1/28/20, at ¶ 18 (emphasis in original).  She agrees with Appellees that her "loss of consortium claim is dependent upon [Mr. Perez's] right to recover, and she could not recover unless the jury found that Appellees were negligent."  Id.  As such, she says she "has a vested interest in the outcome of this appeal, was aggrieved from the decision of the lower court, and has standing to appeal."  Id.

Appellees have not persuaded us that Ms. Perez is not 'aggrieved' under Pa.R.A.P. 501, or that she cannot argue the issues she raises because they purportedly do not relate to her loss of consortium claim. Accordingly, we deny Appellees' application to quash.

<u>Ms. Perez's First Issue</u>

In Ms. Perez's first issue, she argues that the trial court erred "in failing to grant a new trial or, in the alternative, an evidentiary hearing where after-acquired evidence confirmed the existence of an undisclosed relationship between Juror 11 and Ms. Molnar, an adverse witness." Ms. Perez's Brief at 18 (unnecessary capitalization and emphasis omitted). The trial court provided the following background on this issue:

> [D]uring the jury selection process, a woman by the name of Eli[s]abeth Molnar was mentioned as one of thirty-three potential witnesses that would be called to testify in the case on behalf of Mr. Perez. Ms. Molnar was previously Ms. Perez's divorce attorney, although she ultimately was not called to testify at trial, her name was never mentioned during the trial, and to the court['s] knowledge she was never present in the courtroom during the trial. There was no information whatsoever provided to the jury who Ms. Molnar was, or what information she may have had that would have been relevant to the case. Again, she was simply one of a laundry list of thirty-three potential witnesses identified by counsel, most of which were not actually called as witnesses at trial.
>
> On July 13, 2018, more than two months following jury selection, Mr. Perez produced an affidavit of John C. Archiniaco ("Archiniaco affidavit"), who had been providing investigative services on his behalf. The Archiniaco affidavit discloses that Ms. Molnar was "friends on Facebook" with a woman who ultimately was seated at trial as [Juror] 11. The Archiniaco affidavit likewise noted some Facebook "communications in the form of 'likes' on posts and photos" between Ms. Molnar and [Juror] 11 sometime prior to trial. The Archiniaco affidavit was provided to the court as an

> exhibit to [Mr. Perez's] [b]rief [in support of his post-trial motion], as evidence to support the need for further inquiry of the jury as to any irregularities or "outside influence." Thereafter, [Appellees] filed a Motion to Strike Affidavit of John C. Archiniaco, which this court granted on November 9, 2018.

TCO at 9-10 (internal citation omitted).[20]

With respect to why it did not hold an evidentiary hearing, the trial court

explained:

> [Mr. and Ms. Perez] ... argue [that] this [c]ourt erred in denying Mr. Perez's request for an evidentiary hearing on extraneous influences on the jury, again based on the Archiniaco affidavit. The standard for determining the admissibility of post-verdict juror testimony, pursuant to Pennsylvania Rule of Evidence 606(b), is well established:
>
>> Upon an inquiry into the validity of a verdict, ... a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions in reaching a decision upon the verdict or concerning the juror's mental processes in connection therewith, and a juror's affidavit or evidence of any statement by the juror about any of these subjects may not be received. However, a juror may testify concerning whether prejudicial facts not of record, and beyond common knowledge and experience, were improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.
>
> Pratt v. St. Christopher's Hosp., 866 A.2d 313, 320 (Pa. ... 2005) (citations omitted); see also Pa.R.E. 606(b). Furthermore, a trial court employs a limited-scope objective inquiry, which takes into account facts and circumstances of the particular case and focuses on how a typical juror would be affected by influence. Id. at 322-[]24 (citations omitted). This objective inquiry also includes consideration of the associated guidelines in Carter by

---

[20] We note that, with respect to this issue, Mr. Perez additionally filed a supplemental brief in support of his post-trial motion on August 30, 2018, and a motion for a hearing on September 11, 2018, which the trial court subsequently denied.

Carter v. United States Steel Corp., 604 A.2d 1010, 1016-[]17 (Pa. 1992), which provide that a new trial will be granted only where there is a "reasonable likelihood of prejudice." [Pratt, 866 A.2d] at 324. In determining whether there is a reasonable likelihood of prejudice, a trial court should consider the following factors:

> (1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; (2) whether the extraneous influence provided the jury with information they did not have before them at trial; and (3) whether the extraneous influence was emotional or inflammatory in nature.

Carter, 604 A.2d at 1016-[]17 (citations omitted).

Following the jury's verdict, this [c]ourt polled each juror at the request of counsel for Mr. Perez; each juror then affirmed the verdict was their own. [N.T. at] 3597-[]98. Nonetheless, counsel for Mr. Perez expressed serious dissatisfaction with the responses and body languages of some of the jurors, particularly juror number 5 and [Juror] 11. [Id. at] 3601-[]02. Counsel believed "[t]he evidence in this case was overwhelming in favor of [his] client." [Id. at] 3602. Counsel further stated "[t]his is absolutely unbelievable that this verdict came in in this manner," and he would "go to [his] grave saying that." [Id. at] 3602-[]03. [The court] then denied counsel's subsequent request to permit further inquiry of the jury because [it was] confident and comfortable with the individual responses. [Id. at] 3603.

Relying solely on the affidavit of John C. Archiniaco, Mr. Perez then filed a Motion for Hearing Regarding Jury Irregularities on September 11, 2018. Mr. Perez essentially sought an evidentiary hearing to determine whether Ms. Molnar influenced and/or created bias with [Juror] 11. [T]his [c]ourt denied Mr. Perez's request for two reasons: First, because the alleged connection between [Ms.] Molnar and Juror [11] was incredibly weak. Mr. Archiniaco attached only one screenshot allegedly depicting [that Juror] 11 "liked" [Ms.] Molnar's profile picture on Facebook a[t] sometime prior to trial. Mr. Archiniaco provided no other credible or substantive evidence of extraneous influence for this [c]ourt's consideration, other than a vague "friendship on Facebook." Furthermore, even if some connection between the two existed, the simple fact is that Ms. Molnar literally had nothing to do with the trial. She was not a party. She was not a witness. She was

not even present during the course of the trial. She was simply one of thirty-three other potential witnesses identified by counsel prior to trial, literally never to be heard from or about again during the actual trial. Mr. Perez has cited no case[]law which would require further inquiry into a relationship between a juror and a non-participant at trial, and therefore the motion for a further evidentiary hearing regarding extraneous influences of the jury was denied.

TCO at 11-14.

Before proceeding to the merits of this issue, we must ascertain whether Ms. Perez has preserved it for our review. Appellees insist that Ms. Perez "never raised an alleged 'Facebook' relationship between Juror … 11 and [Ms.] Molnar at any point during trial or post-trial proceedings. She did not file a [m]otion requesting an evidentiary hearing as to any potential extraneous influence on Juror … 11 and did not join in Mr. Perez's [m]otion for such a hearing. Likewise, Ms. Perez did not oppose [Appellees'] Motion to Strike Affidavit of John C. Archiniaco or join in Mr. Perez's opposition of said [m]otion." Appellees' Brief at 23. Thus, Appellees say this issue has been waived. Id. We agree, as "it is the appellant's obligation to demonstrate which appellate issues were preserved for review." Commonwealth v. Rush, 959 A.2d 945, 949 (Pa. Super. 2008) (citing Pa.R.A.P. 2117(c), 2119(e)); see also Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Here, Ms. Perez has not demonstrated how she raised and preserved this issue below. See

Ms. Perez's Brief at 19-20 (explaining how Mr. Perez raised this issue below).[21] Accordingly, this issue is waived.

Nevertheless, even if not waived and to the extent the issue is not waived by Mr. Perez, who incorporated by reference this issue in his brief, we would not grant relief. We apply the following standard of review:

> We will reverse a trial court's decision to deny a motion for a new trial only if the trial court abused its discretion. An abuse of discretion exists when the trial court has rendered a decision or a judgment which is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias or ill will. This Court may not substitute its judgment for that of the trial court. A finding by an appellate court that it would have reached a different result than the trial court does not constitute a finding of an abuse of discretion. If the record adequately supports the trial court's reasons and factual basis, an abuse of discretion will not be found.

_____

[21] We recognize that Ms. Perez joined in, and incorporated by reference, Mr. Perez's motion for post-trial relief and brief in support thereof, which set forth that Mr. Perez "obtained after-acquired evidence relating to Juror … 11 and Ms. Molnar[,]" and "[b]ecause of this undisclosed relationship, a new trial is in order or[,] in the alternative[,] an evidentiary hearing is necessary to further ascertain the details of said relationship and why it was not disclosed to [Mr. Perez] during jury selection." See Mr. Perez's Brief in Support of Post-Trial Motion at 53. However, most of the theories and arguments supporting this request for relief were developed below by way of Mr. Perez's Supplemental Brief in Support of Motion for Post-Trial Relief and Motion for Hearing, which — based on our review of the record — Ms. Perez did not join or incorporate by reference. Further, to the extent Ms. Perez argues that we should grant a new trial where after-discovered evidence confirmed the existence of a relationship between Juror 11 and Ms. Molnar, this claim is also waived due to Ms. Perez's failure to clearly include it in her Rule 1925(b) concise statement. See Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

Pratt v. St. Christopher's Hosp., 824 A.2d 299, 302 (Pa. Super. 2003), aff'd 866 A.2d 313 (Pa. 2005) (internal citations and quotation marks omitted).

First, Ms. Perez argues that Mr. Archiniaco's affidavit "provided direct, after-discovered evidence of an undisclosed relationship between an adverse trial witness and Juror 11, and such evidence provides for a presumption of prejudice which warrants a new trial." Ms. Perez's Brief at 20 (unnecessary capitalization and emphasis omitted). Ms. Perez points to case law providing that "[t]here are situations ... when a court will presume prejudice on the part of one of the jurors in order to insure fairness[,]" and explaining that "[a] challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice...." Id. at 20, 21 (citations and emphasis omitted).[22] In this instance, she says that prejudice should be presumed because:

> Juror 11 sat as a juror in this case yet never disclosed her relationship with Ms. Molnar, a witness connected to Ms. Perez and hostile to Mr. Perez. Mr. Perez (through his counsel via writ of summons), sued [Ms.] Molnar and also identified that she appeared to be working in tandem with Dr. Maroon's daughter. (R. 001882, 003941a-003943a). As such, it is likely that Ms. Molnar, or even Dr. Maroon himself, had the power to exercise control over Juror 11. Without any other facts, that, unto itself, is enough to establish a presumption of prejudice that would require a new trial.

---

[22] With respect to our standard of review, Ms. Perez notes that where "a juror has a close relationship with a participant in the case, the determination is practically one of law and as such is subject to ordinary review." Ms. Perez's Brief at 21 (citing McHugh v. P&G Papers Prods. Cp., 776 A.2d 266, 270 (Pa. Super. 2001)); see also id. at 3.

Id. at 23-24.

Even if properly preserved, we would reject this argument. In support of the theory that Ms. Molnar was working in tandem with Dr. Maroon's daughter and had the power to control Juror 11, Ms. Perez cites only to arguments — not evidence — advanced by Mr. Perez's counsel at oral argument on post-trial motions.[23] Thus, we would agree with the trial court that the alleged link between Mr. Molnar and Juror 11 was "incredibly weak[,]" as "Mr. Archiniaco attached only one screenshot allegedly depicting [that Juror] 11 'liked' [Ms.] Molnar's profile picture on Facebook a[t] sometime prior to trial" and did not provide any "other credible or substantive evidence of extraneous influence for this [c]ourt's consideration, other than a vague 'friendship on Facebook.'" TCO at 13.[24] Moreover, the trial court persuasively observed that Ms. Molnar "had nothing to do with the trial[,]" as she was "simply one of thirty-three other potential witnesses identified by counsel prior to trial, literally never to be heard from or about again during the actual trial." Id. Accordingly, Ms. Perez has not demonstrated that Juror 11 had a close

_____

[23] Appellees also recognize that Ms. Perez's theory is counterintuitive to the extent that "Ms. Molnar, Ms. Perez's divorce attorney, controlled one of the jurors so that her client would ultimately lose out on a recovery at trial." Appellees' Brief at 28.

[24] Cf. Schwarzbach v. Dunn, 381 A.2d 1295, 1298 (Pa. Super. 1977) (determining that the "potential for prejudice was great" where it was "quite possible that a secretary in a law office could influence her husband in deciding a matter in which her employer is counsel for one of the parties").

relationship with a witness at trial, which would warrant a presumption of prejudice and necessitate a new trial.[25]  As such, we would not determine that the trial court abused its discretion by denying Mr. Perez's request for a new trial on this basis.

Second, Ms. Perez contends that, "[a]lthough the relationship between Juror 11 and [Ms.] Molnar warrants a presumption of prejudice and automatic new trial…, at the very least, the trial court should have granted an evidentiary hearing or conducted further inquiry post-verdict to address the jury issues raised."  Ms. Perez's Brief at 28.  Ms. Perez states that, "even if the relationship between [Ms.] Molnar and Juror 11 is deemed to be remote, further questioning should have been conducted to determine if Juror 11 was influenced by [Ms.] Molnar (or ultimately, Dr. Maroon) and if that influence impacted the verdict."  Id. at 29.

Our Supreme Court has explained that, where post-verdict allegations of extraneous information and/or outside influence affecting jury deliberations arise, "[t]he procedure for development of such claims and their ultimate disposition remain vested, in the first instance, within the sound discretion of the trial courts."  Pratt, 866 A.2d at 324.  In the case sub judice, we reiterate the trial court's observation that Mr. Perez provided no meaningful evidence of extraneous influence, only that Ms. Molnar and Juror 11 were friends on Facebook.  TCO at 13.  As Appellees identify, "[n]either Ms. Perez nor Mr.

_____

[25] Our referral to the citation "R. 001882" leads us to the index of a trial transcript, which we presume is error.

Perez has ever presented even a hint of actual evidence of an extraneous influence on the jury's verdict. Rather, counsel for Mr. Perez requested an evidentiary hearing so that he might uncover outside influences. The post-verdict discovery of a Facebook 'relationship' between a hypothetical witness and a juror reveals nothing of relevance to a Rule 606(b) determination...." Appellees' Brief at 33. We agree. Accordingly, we would conclude that the trial court did not abuse its discretion in denying Mr. Perez's request for an evidentiary hearing.

### Ms. Perez's Second Issue

In Ms. Perez's second issue, she argues that the verdict was against the weight of the evidence. Ms. Perez's Brief at 30.[26] She avers that "[t]he weight of the evidence established that Dr. Maroon was at least a factual cause of harm to Mr. Perez and the fact that the jury decided that issue against Mr. Perez is beyond shocking." Id. She raises a multitude of arguments as to why the verdict was against the weight of the evidence, pointing to, inter alia, x-rays, animated swallowing studies, Mr. Perez's experts' testimony, medical records, Mr. Perez's pain and difficulty swallowing, Dr. Hecht's testimony, and the trial court's own statements at trial. See id. at 30-40.

> We apply the following standard of review:
>
> Our review of the denial of a motion for a new trial based on weight of the evidence is limited. We must determine whether

_____

[26] As mentioned supra, Ms. Perez joined in, and incorporated by reference, Mr. Perez's motion for post-trial relief and brief in support thereof, which included therein a weight-of-the-evidence claim.

the trial court abused its discretion in denying a new trial, not whether the verdict, in this Court's opinion, is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge. We have noted that [o]ne of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence.

Cragle v. O'Brien, 225 A.3d 182, 189 (Pa. Super. 2019) (internal citations and quotation marks omitted). Further, we acknowledge:

Given the primary role of the jury in determining questions of credibility and evidentiary weight, this settled but extraordinary power vested in trial judges to upset a jury verdict on grounds of evidentiary weight is very narrowly circumscribed.

A new trial is warranted on weight of the evidence grounds only in truly extraordinary circumstances, i.e., when the jury's verdict is so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. This Court has also noted that one of the reasons that the power and duty to upset a verdict on weight grounds is so narrowly circumscribed is because of the obvious tension between the broad, settled, exclusive role of the fact-finder in assessing credibility and the limited power of trial judges, in narrowly circumscribed circumstances, to overturn those assessments when the judicial conscience is not merely disappointed, or uncomfortable, but shocked.

Mirizio v. Joseph, 4 A.3d 1073, 1088 (Pa. Super. 2010) (citation omitted).

In the case at bar, the trial court explained why it denied Mr. Perez's weight claim as follows:

In his [m]otion for [p]ost-[t]rial [r]elief, Mr. Perez spent considerable time re-arguing the issue of negligence despite the jury's finding of negligence. With respect to the issue of causation, Mr. Perez merely asserted [that] he presented numerous credible witnesses, in contrast to [Appellees'] few incredible witnesses. However, it is not the role of this court to "pass on the credibility of witnesses or to act as a trier of fact." [Worley v. County of Delaware, 178 A.3d 213, 238 (Pa.

Cmwlth. 2017)]. Furthermore, the jury is free to credit the testimony of one expert and reject the testimony of the other expert where the parties' medical experts disagree on whether or not an accident caused some injury to the plaintiff. Kraner v. Kraner, 841 A.2d 141, 145 (Pa. Super. 2004) (jury verdict was contrary to weight of the evidence where jury found driver negligent, but declined to award passenger damages for her injuries, despite all three experts agreeing that passenger sustained some injury as a result of motor vehicle accident).

[As stated in the court's analysis regarding Mr. Perez's motion for JNOV, t]here was substantial support in the record for the jury's finding that Dr. Maroon's negligence was not a factual cause of any injury to Mr. Perez. Thus, the verdict in this case is not "so contrary to the evidence as to shock one's sense of justice[.]" Worley, 178 A.3d at 237-[]38.

TCO at 18 (some brackets in original).

We discern no abuse of discretion by the trial court. Furthermore, we agree with Appellees that Ms. Perez's weight argument "ignore[s] the province of the jury and overlook[s] the mountain of contradictory evidence presented by the defense — either by way of direct examination of witnesses or refutation of Mr. Perez's evidence during cross-examination of his witnesses." Appellees' Brief at 36 (citing TCO at 14-17). Accordingly, Ms. Perez's weight claim fails. Consequently, as none of the claims presented by Mr. and Ms. Perez warrants relief, we affirm the judgment entered in favor of Appellees.

Judgment affirmed.

Judge Pellegrini joins this memorandum.

Judge Bowes concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  6/10/2020